IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MELISSA JENNINGS,                          )
                                            )
                  Plaintiff,                )
                                            )
v.                                          )          1:99CV400
                                            )
UNIVERSITY OF NORTH CAROLINA                )
at CHAPEL HILL, et al.                      )
                                            )
                  Defendant.                )
_____   )

MEMORANDUM OPINION

TILLEY, Chief Judge

This matter is before the court on the following motions: Defendants' Motion

for Summary Judgment [Doc. #115]; Plaintiff's Motion to Strike Amended Answer

by Defendants and for Default Judgment [Doc. #137]; and Plaintiff's Motion to

Strike Exhibits C through H to the Affidavit of Anson Dorrance [Doc. # 142]. For

the reasons set forth below, both of Plaintiff's Motions to Strike will be DENIED

and Defendants' Motion for Summary Judgment will be GRANTED.

I.

The facts of this case viewed in the light most favorable to the Plaintiff are

as follows.[1] The sole remaining Plaintiff[2] in this case, Melissa Jennings, was a

_____

[1] Because the majority of this Opinion is devoted to Defendants' summary
judgment motion, the facts are set out here according to that standard.

[2] Former Plaintiff Deborah Keller Hill is no longer a party to this action.

1

member of the University of North Carolina at Chapel Hill ("UNC") women's intercollegiate soccer team ("the team") from August 1996 until she was dismissed from the team in May 1998. During this time, Defendant Anson Dorrance was the team's head coach and Defendant William Palladino was an assistant coach. Also at that time, the following defendants were employed by UNC: Michael Hooker, as Chancellor;[3] Susan Ehringhaus, as Assistant to the Chancellor and Senior University Counsel; John Swofford, as Director of Athletics; Richard Baddour, as Director of Athletics;[4] and Clara Elizabeth ("Beth") Miller, as Senior Associate Director of Athletics. All of these defendants are sued in their individual capacities. The University is also a defendant in this action.

Ms. Jennings was recruited by Mr. Dorrance to join the UNC women's soccer team as a goal keeper. (Jennings Dep. at 31-32.) She did not receive an athletic scholarship. (Dorrance Aff. at 1.) During the two academic years that Ms. Jennings was a member of the team, she claims to have overheard several comments about other team members made by Coaches Dorrance and Palladino, particularly at pre-practice warm-up sessions. Ms. Jennings also claims that on two occasions Mr. Dorrance made direct inquiries into her personal life. Ms. Jennings' legal claims against the Defendants are based on those comments, remarks, and conversations.

---

[3] Chancellor Hooker is now deceased. The claims are against his estate.

[4] Mr. Baddour became Director of Athletics on July 1, 1997.

2

It was common for team members to warm up together before practice by stretching. During those warm-up sessions, the team members would often discuss their personal lives including at times their sexual activities. According to Ms. Jennings, Mr. Dorrance would, on occasion, come over to the players during warm-up time, or when they were congregating at the soccer office on the practice field known as "the Hut."[5] When he joined them, he would occasionally also participate in their conversations, asking the players about their activities over the weekend and sometimes discussing the people with whom the players were sexually involved. He did not initiate these conversations about sexual activities. Ms. Jennings points to particular comments that Mr. Dorrance allegedly made on a few occasions when he joined the players' conversations. He allegedly made reference to one players's sexual partner as the "fuck of the minute" (Jennings Dep. at 52), and asked another if she was going to have a "shag fest" with her boyfriend and if she was going to "fuck him and leave him" (Id. at 53, 63). According to Ms. Jennings, Mr. Dorrance used the word "fuck" very often. (Id. at 38, 79.) Mr. Dorrance also allegedly talked about boys coming out of the players' windows after one player said she had climbed into one person's window after a sexual encounter with a different person. (Id. at 64; Keller Dep. at 121.)

---

[5] Ms. Jennings does not provide a clear estimate of how often Mr. Dorrance came over to the players during warm-ups. According to Ms. Keller's deposition testimony, he would come over to them about once or twice a week, but did not always make comments. When he did make comments, they did not always deal with the social or sexual activities of the players. (Keller Dep. 127, 132.)

3

Ms. Jennings claims Mr. Dorrance also sometimes commented on players' physical attributes, including their legs and breasts. (Jennings Dep. at 44, 51, 83) She alleges that he once called one player a "fat ass" (Id. at 91) and that he sometimes referred to another player, who was thought to be a lesbian, by a masculine name (Id. at 97, 98). Ms. Jennings also claims to have overheard Mr. Dorrance in a conversation with Mr. Prentice refer to an "Asian threesome," which she interpreted as Mr. Dorrance and two members of the team. (Id. at 44.) She says that he "made [one member of the team] out to be the team slut" and actually called that player a "slut," possibly in Mr. Palladino's presence. (Id. at 76.) Finally, Ms. Jennings claims to have heard from other players that Mr. Dorrance told Ms. Keller he would like to be a "fly on the wall" the first time one player had sex. (Id. at 52.) Some players, including those who were the subjects of the comments, appeared to be flattered, or at least not offended, by Mr. Dorrance's behavior. (Id. at 87, 88, 90; see Affs. of Falk, Fettig, Dacey.) Others appeared to Ms. Jennings to be upset by it. (Jennings Dep. at 49-50, 97-98.)

Mr. Palladino seems to have joined in the conversations and made comments less frequently than Mr. Dorrance. His role appears to have been a passive one, laughing at something the players said or at a comment Mr. Dorrance made about a player. (Keller Dep. at 125.) Ms. Jennings alleges that she once heard him and Mr. Dorrance "joking back and forth about [how] they had been sending dirty e-mails, dirty jokes between them." (Jennings Dep. at 76.) Ms. Jennings said in her

4

deposition that Mr. Palladino did not humiliate any of the women on the team. (Id. at 106.)

Ms. Jennings did not normally participate in the discussions about dating and sexual activities during team warm-up time, nor was she a target of Mr. Dorrance's comments about players' bodies. On two occasions, however, she was the focus of a conversation in Mr. Dorrance's presence that made her uncomfortable. During one of those conversations Mr. Dorrance made a direct inquiry of her; during the other he was merely present. The first occurred during warm-up time before practice. When the team was discussing their dating relationships, the conversation turned to Ms. Jennings, and what she was going to do with her boyfriend that weekend. Mr. Dorrance did not initiate this turn in the conversation, but he did join in the inquiry once it was made, saying "Yes, what about Trim'n?"[6] (Id. at 67.) Ms. Jennings did not respond to any of the speculation about her weekend. (Id. at 68.) Shortly after that incident, her teammates asked whether one of Ms. Jennings' male friends who had attended a game was her boyfriend. Mr. Dorrance was also present for that conversation. (Id. at 73.)

After the fall season and before the end of her freshman year, Ms. Jennings claims to have met with Mr. Dorrance individually. This "end-of season" meeting allegedly took place in Mr. Dorrance's hotel room while the team was attending a

---

[6] "Trim'n" was Melissa Jennings' nickname among the players and coaches. It was an adaptation of her custom license plate, and was not related to sex. (Id. at 61-62.)

5

tournament in Santa Clara, California. Mr. Dorrance began the meeting by discussing Ms. Jennings' grades, which were low enough that she may have been in danger of becoming academically ineligible to play soccer. (Id. at 129-30.) He expressed that she needed to bring her grades up to the team standard, and although he did not say so directly, Ms. Jennings understood from the meeting that if she did not bring her grades up, she was in danger of being dismissed from the team. Mr. Dorrance then inquired into Ms. Jennings' social life, and whether this was affecting her grades. According to Ms. Jennings, Mr. Dorrance asked her, "Who are you fucking?" and Ms. Jennings replied that it was "none of his goddamn business" what she did off the field. (Id. at 145.) The discussion then moved to Ms. Jennings' physical performance as a player, which Mr. Dorrance also felt was not up to team standards. She left the meeting in tears. (Id. at 143-44.)

Ms. Jennings did not complain to Mr. Dorrance or Mr. Palladino about the behavior she claims she found offensive. She does claim to have met with Ms. Ehringhaus, who was Assistant to the Chancellor, twice in the fall of her freshman year. At the first meeting, Ms. Jennings says she told Ms. Ehringhaus about the "sexual comments that were being made" at practice. (Id. at 157-59.) They also discussed Ms. Jennings' dismay that Mr. Dorrance had not informed her teammates that she had been to the emergency room (this was her "first concern" in the conversation), her discomfort with the drinking that took place at some of the parties at players' houses, and her need to be reimbursed for supplies she had

6

purchased at Mr. Dorrance's direction. (Id. at 153-55.) At the second meeting, Ms. Jennings did not mention the sexual comments, but concentrated on the reimbursement issue. (Id. at 161.)

In May of 1998, Ms. Jennings attended a scheduled meeting with Mr. Dorrance at which he dismissed her from the team. Ms. Jennings claims that this action surprised her, because she felt that she had improved in her academic, physical, and social performance on the team. (Id. at 207.) She says Mr. Dorrance told her at this meeting that her physical fitness was not up to team standards. (Id. at 206.) She says she does not remember the details of the meeting after Mr. Dorrance told her she was cut. (Id. at 206.) Mr. Dorrance in his affidavit cites Ms. Jennings' failure to contribute physically, academically, and socially to the team as the reason he dismissed her. (Dorrance Aff. at 3.) According to Mr. Dorrance, he evaluated "reserves" (team members who do not play for meaningful portions of games) and permitted them to remain on the team on the basis of their contribution to the team's success in at least two of those three areas. (Id. at 2-3.) Ms. Jennings was not a starter and did not play in games very often. (Id. at 2; Jennings Dep. at 149.)

After she was dismissed from the team, Ms. Jennings' father, Craig Jennings, called and faxed Ms. Ehringhaus' office several times from May 6 to May 10. He did not mention any sexually inappropriate behavior or harassment. (Ehringhaus Aff. at 2, Ex. A-C.) In a letter to Ms. Ehringhaus dated May 12, Mr.

7

Jennings for the first time complained of Mr. Dorrance making "inappropriate" inquiries of players such as "Who is shacking up with whom?" (Id. at 3, Ex. E.) The letter did not mention Mr. Palladino. Around that same time, Ms. Ehringhaus received a letter from Ms. Keller's parents complaining of "serious harassment" by Mr. Dorrance. (Id. at 4.) Consistent with UNC's Sexual Harassment Policy in place at the time, Ms. Ehringhaus forwarded the complaints to Mr. Baddour. Under the policy, Mr. Dorrance's supervisors, including Mr. Baddour and Ms. Miller, were responsible for reviewing the complaints and Mr. Dorrance's behavior. (Id.) In late May, a meeting took place among Ms. Jennings, Mr. Jennings, Mr. Baddour, Ms. Miller, Mr. Dorrance, and Ms. Ehringhaus. (Id. at 6; Jennings Dep. at 224.) In that meeting, Ms. Jennings' dismissal from the team was discussed, as was Mr. Dorrance's behavior that Ms. Jennings claims to have found offensive. (Jennings Dep. at 224.) Mr. Palladino was not present at the meeting. Incident to the UNC Athletic Department's investigation of the complaints against him, in June 1998 Mr. Dorrance apologized to Ms. Jennings and was directed to refrain in the future from discussing matters of a sexual nature with players. (Baddour Aff. at 2-3; Ehringhaus Aff. Ex. N.) On August 25, 1998, Ms. Jennings and Ms. Keller filed the complaint that initiated this case.

II.

In Plaintiff's Motion to Strike Defendants' Amended Answer and to Enter Default Judgment for Plaintiff, Ms. Jennings asserts that Mr. Dorrance made a

8

statement in his deposition testimony that contradicted Defendants' Amended Answer. In the Amended Answer, Defendants denied Paragraph 19 of Plaintiff's First Amended Complaint which asserted that "On repeated occasions from 1996 through the present, Dorrance used his position of authority as women's soccer coach to make lewd and degrading comments regarding other team members in the presence of plaintiffs." In his deposition, Mr. Dorrance stated that he could not remember the content of all conversations he engaged in with players before practices, and could therefore neither admit nor deny "whether [he] discussed sexual activity among the team players." (Dorrance Dep. at 51.)

A party must have acted in bad faith or willful disobedience of a court order before a court may use its inherent powers to impose sanctions. Roadway Express, Inc. v. Piper, 447 U.S. 752, 766 (1980); Strag v. Bd. of Tr., 55 F.3d 943, 955 (4th Cir. 1995). Mr. Dorrance's response in his deposition does not necessitate striking Defendants' Amended Answer. It is not clearly factually inconsistent with the Amended Answer, particularly since it was given in response to a less than clear line of questioning. Furthermore, the response is not the type of behavior that would prompt the Court to use its inherent powers to strike the Amended Answer or to enter default judgment against Defendants for filing false pleadings. There is no evidence of bad faith. Plaintiff's motion to strike and to enter default judgment will therefore be DENIED.

9

III.

Plaintiff also moves to strike exhibits C through H to the affidavit of Mr. Dorrance on the grounds that they are not authenticated and are hearsay, and therefore improper for the Court to consider in ruling on the Defendants' motion for summary judgment. In considering a motion for summary judgment, a court may not consider documents that at trial would constitute inadmissible hearsay. <u>Fed. R. Civ. P.</u> 56(e) ("[A]ffidavits shall...set forth such facts as would be admissible in evidence."); <u>Md. Highway Contractors Ass'n v. Maryland</u>, 933 F.2d 1246, 1251-52 (4th Cir. 1991) ("[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment."). A court may, however, consider evidence that would fall under a hearsay exception. Federal Rule of Evidence 803(6) states that "Records of Regularly Conducted Activity" are an exception to the hearsay rule. <u>Fed. R. Evid.</u> 803(6). Such records are a data compilation of events, conditions, or opinions made at or near the time of the events, conditions, or opinions by a person with personal knowledge of them, kept in the course of a regularly conducted activity and recorded as a regular practice. <u>Id.</u> This may be testified to by either the custodian of the information or a qualified witness. <u>Id.</u>

The exhibits at issue are as follows. Exhibit C is final statistical composite rankings, evaluating the team in fitness, competition, and technical skill at the end of the fall season in 1997. Exhibit D is an academic ranking of all players by cumulative grade point average at the end of spring 1998. Exhibit E is the results

10

of standard physical tests of the players in spring 1998. Exhibit F is the spring 1998 "final statistical composite power rankings" (similar to Exhibit C). Exhibit G is the instructions for a team self-evaluation conducted in spring 1998. Exhibit H is a compilation of the results of the evaluations described in Exhibit G.

These six exhibits are properly authenticated; they are attached to a sworn affidavit and are described by the affiant. Cf. Orsi v. Kirkwood, 999 F.2d 86, 91 (4th Cir. 1993) (upholding trial court's decision not to admit into evidence unsigned documents introduced the day of trial where "[n]one of the documents were authenticated through attached affidavits"). On the issue of hearsay, the exhibits qualify as Records of Regularly Conducted Activity, and would be admissible at trial. See Fed. R. Evid. 803(6). Mr. Dorrance testified in his affidavit that he developed the formats in which the information in these exhibits was recorded in order to evaluate team members' performance and improvement. This testimony reveals that he is qualified to testify about the exhibits, and that the information contained in the exhibits was accurately kept, as it would be of little use to his evaluations if it were not. Ms. Jennings' vague assertion that the exhibits are "incomplete" is also unconvincing; Mr. Dorrance's testimony gives a satisfactory explanation of the format of the exhibits. Plaintiff's motion to strike these exhibits will be DENIED.

IV.

Defendants move for summary judgment on all of the claims that remain

11

from the First Amended Complaint: (A) the Title IX claim against the University; (B) the § 1983 claims for damages against Dorrance for invasion of privacy, against Dorrance and Palladino for sexual harassment, and against Ehringhaus, Swofford, Baddour, Miller, and the Hooker estate for failure to supervise Dorrance and Palladino and prevent the alleged violations of Ms. Jennings' rights; and (C) the common law invasion of privacy claim against Dorrance.

Summary judgment is appropriate when, viewing the facts in the light most favorable to the non-moving party, there is no genuine issue of any material fact. Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Cox v. County of Prince William, 249 F.3d 295, 299 (4th Cir. 2001). Material facts are those that support an essential element of the claim. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In other words, a fact is material "when its existence or non-existence could lead a jury to different outcomes." Cox, 249 F.3d at 299. A genuine issue exists if a reasonable jury could return a verdict for the non-moving party based on the evidence. Id. Judgment as a matter of law is appropriate where the non-moving party has failed to raise a genuine issue of material fact on an element on which that party would bear the burden of proof at trial. Celotex, 477 U.S. at 322-23.

A.

Defendants move for summary judgment on Ms. Jennings' Title IX claim against the University. Title IX states in relevant part: "No person in the United

12

States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (2004). Courts have looked to case law for Title VII of the Civil Rights Act of 1964 which addresses sexual discrimination in the workplace, see 42 U.S.C. §2000e-2(a)(1) (2004), to establish what constitutes discrimination based on sex under Title IX. See Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 649-51 (1999) (Title IX case relying on Title VII decisions to establish that "sexual harassment can constitute discrimination on the basis of sex under Title IX"); Gebser v. Lago Vista Ind. Sch. Dist., 524 U.S. 274, 281-83 (1998) (same); Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60, 75 (1992) (Title IX case relying on Title VII case Meritor Sav. Bank v. Vinson, 477 U.S. 57, 64 (1986), to establish that a male teacher's sexual harassment of a female student is discrimination on the basis of sex). Sexual harassment as recognized by Title VII precedent is therefore considered a form of discrimination for Title IX purposes. See, e.g., Davis, 526 U.S. at 649-51. This includes so-called "hostile environment" sexual harassment, which is alleged in this case. See Meritor, 477 U.S. at 66 (recognizing hostile environment sexual harassment as actionable under Title VII); Davis, 526 U.S. at 651 (citing Meritor with approval).

In order to be actionable under Title IX, the sexual harassment must be "so

13

severe, pervasive, and objectively[7] offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." Davis, 526 U.S. at 650. "[T]he objective severity of the harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" Oncale v. Sundowner Offshore Services, 523 U.S. 75, 81 (1998) (quoting Harris v. Forklift Sys., 510 U.S. 17, 23 (1993)). Such an inquiry requires "careful consideration of the social context" in which the alleged discrimination occurred. Id. The impact of the behavior in its social context in turn depends upon a "constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used" by the alleged harasser. Id. at 81-82. Possible components of this constellation are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it interferes with an employee's work performance," Harris, 510 U.S. at 23; as well as the ages of the harasser and the victim and the number of individuals involved, Davis, 526 U.S. at 651 (looking to Department of Education,

_____

[7] It is unclear whether subjective offensiveness, which is a requirement in Title VII cases, see Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998), is also a requirement in Title IX cases. Although Davis cites Title VII precedent, the standard developed there refers only to objective, and not subjective, offensiveness. Davis, 526 U.S. at 633. The decision in this case does not depend on whether Ms. Jennings subjectively found the behavior offensive, because the facts she has alleged do not support a finding even of objective offensiveness. Therefore, the issue need not be resolved in this Opinion.

14

Office of Civil Rights, Sexual Harassment Guidance, 62 Fed. Reg. 12034, 12041-42 (1997)). "These standards for judging hostility are sufficiently demanding to ensure that Title VII [and by extension, Title IX] does not become a general civility code....Properly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as sporadic use of abusive language, gender-related jokes, and occasional teasing." Faragher, 524 U.S. at 788 (internal quotations and citations omitted). In analyzing sexual harassment claims, courts should employ "[c]ommon sense, and an appropriate sensitivity to social context." Oncale, 523 U.S. at 82.

Finally, in addition to showing severe, pervasive, and objectively offensive sexual harassment, a Title IX plaintiff seeking monetary damages in a private action[8] must show that the funding recipient or an official with the power to address the discrimination on behalf of the recipient had actual knowledge of the discrimination and acted with deliberate indifference. Davis, 526 U.S. at 650. The deliberate indifference must effectively cause the discrimination. Id. at 642-43.

There is no genuine issue of any material fact on any of the elements of Ms. Jennings' Title IX claim. While inappropriate in some respects and quite possibly offensive to her, the conduct that she alleges occurred was not "severe, pervasive

---

[8] In Cannon v. University of Chicago, 441 U.S. 677, 689 (1979), the Supreme Court recognized an implied right of action under Title IX. In Franklin, 503 U.S. at 76, the Court confirmed that monetary damages are an available remedy in such an action.

and objectively offensive" to the point of depriving her of educational opportunities. The comments Ms. Jennings claims to have found offensive occurred less than weekly. When comments were made, they were not severe, especially when the social context is considered.[9] The players were teasing and joking amongst themselves on these occasions. Mr. Dorrance did not initiate these discussions or steer the players' conversation in the direction of sex. The comments were only "mere utterances," and were not physically threatening. There is no evidence, beyond Ms. Jennings' own vague assertion, that the atmosphere at practice interfered with her performance on the field or in the classroom. In fact, in contradiction to that claim, Ms. Jennings stated that before each of her meetings with Mr. Dorrance, she believed that her academic and physical performances had improved. (Jennings Dep. at 125-26, 207.)

As for the inquiries Mr. Dorrance allegedly made directly to Ms. Jennings, one of these occurred in a group setting and was only mildly related to any sort of sexual topic. In the setting of an athletic practice where players are discussing their social activities, a coach inquiring about a player's weekend, or about whether a certain person is her boyfriend, is not harassment. Even if the inquiry about her weekend was made in the context of other players discussing their sexual

_____

[9] The number of individuals involved is also a part of the social context. Ms. Jennings alleges that several players were the focus of Mr. Dorrance's comments. However, these players were presumably all present together when the comments were allegedly made, and they had initiated the conversations.

16

activities, Ms. Jennings admits that the "What about Trim'n?" inquiry was "totally different" than when Mr. Dorrance was talking about "guys coming out of the windows." (Jennings Dep. at 67.) The conversation Ms. Jennings alleges took place in Mr. Dorrance's hotel room does not elevate the cumulative effect of the other comments to the level of severe and pervasive harassment. The question, "Who are you fucking?" is admittedly harsh. However, it is only one question, and it was asked immediately after his discussion of her low grades. When she rebuffed the question, Mr. Dorrance did not make any further inquiry or discuss any sexual matters. Indeed, this is the only time Ms. Jennings alleges that he alluded to sex in relation to her. Nor was the comment physically threatening; it was at most a "mere offensive utterance." While there is a large disparity in ages between Mr. Dorrance and Ms. Jennings, the social context also incorporates the fact that he was her coach and had an interest in her academic performance and the factors affecting it, especially insofar as her academics impacted her eligibility to play.

Finally, Mr. Palladino made fewer comments and did so even less frequently than Mr. Dorrance. The same analysis applies to his conduct as applies to Mr. Dorrance's. Thus, considering the "constellation of circumstances," the behavior at issue does not constitute severe, pervasive, and objectively offensive sexual harassment that deprived Ms. Jennings of her educational opportunities. The defendants are entitled to summary judgment on this claim.

17

B.

Ms. Jennings makes several claims for damages under 42 U.S.C. § 1983, which states: "Every person who, under color of any statute...subjects, or causes to be subjected, any citizen of the United States...to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured...." 42 U.S.C. § 1983 (2004). All claims are against Defendants in their individual capacities. To establish §1983 individual liability, a plaintiff must affirmatively show that the defendant personally acted to deprive her of her rights. Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985). The individual defendant must have had "personal knowledge of and involvement in the alleged deprivation of [plaintiff's] rights in order to be liable." Id.

1.

Ms. Jennings alleges that Mr. Dorrance violated her constitutional right to privacy. There are two generally recognized privacy interests: the "interest in independence in making certain kinds of important decisions" and the "interest in avoiding disclosure of personal matters." Whalen v. Roe, 429 U.S. 589, 599-600 (1977). The former interest has most often been implicated by laws that affect an individual's decisions regarding marriage, procreation and contraception, family relationships, and the rearing and education of children. Id. at 600 n.26; Paul v. Davis, 424 U.S. 693, 713 (1976). The latter interest, the right to "informational privacy," Greenville, 317 F.3d at 359, may be implicated when an individual is

18

forced to disclose information regarding, for instance, sexual matters or his body and health. See Whalen, 429 U.S. at 602 (medical information); Eastwood v. Dep't of Corr. of Okla., 846 F.2d 627, 631 (10th Cir. 1988) (sexual history); United States v. Westinghouse Elec. Corp., 638 F.2d 570, 578 (3d Cir. 1980) (medical information); see also Jennings v. UNC, 240 F. Supp. 2d 492, 505 (M.D.N.C. 2002). Cases on this subject often deal with the questioning of employees or potential employees by employers, see, e.g., Walls v. City of Petersburg, 895 F.2d 188, 193-94 (4th Cir. 1990) (employee questionnaire inquiring into homosexual relationships, marital status, children, arrest of family members, and financial information), or with statutes requiring disclosure of personal, medical information, see, e.g., Whalen, 429 U.S. at 602 (database of recipients of prescriptions for controlled substances); Greenville Women's Clinic v. Comm'r, S.C. Dep't of Health and Envtl. Control, 317 F.3d 357, 370 (4th Cir. 2002) (reporting requirements for abortion clinics).

Ms. Jennings' circumstances are clearly distinguishable from precedent in both the independent decision-making and informational privacy lines of cases. She asserts that Mr. Dorrance's two isolated inquiries into her dating relationships violated both her right to make decisions about procreation and her right to avoid disclosure of personal information. However, there is no evidence that Ms. Jennings' ability to make decisions about procreation was in any way substantively impeded by Mr. Dorrance's inquiries. As for the right to informational privacy, Ms.

19

Jennings' situation is clearly distinguishable from that of the employees in cases such as Walls, 895 F.2d at 190, where plaintiff was dismissed for her failure to respond to an employee questionnaire, or Eastwood, 846 F.2d at 631, where plaintiff was threatened with dismissal and "forced to answer" questions about her sexual history. In Ms. Jennings' case, disclosure of personal information was not required, nor was she forced to answer questions about her sexual activities. In fact, she never disclosed any personal information. Neither did her failure to disclose such information result in her dismissal from the team. She was not dismissed until over a year after her refusal to answer Mr. Dorrance's inquiry into her sexual activity. Ms. Jennings has raised no genuine issues of material fact that could lead a reasonable jury to conclude that Mr. Dorrance violated her right to privacy. Mr. Dorrance is therefore entitled to judgment as a matter of law on this claim.

2.

Ms. Jennings also claims that Mr. Dorrance and Mr. Palladino violated her constitutional rights by sexually harassing her. An individual has a constitutional right to be free from gender discrimination that does not serve an important governmental objective and is not substantially related to achieving that objective. Davis v. Passman, 442 U.S. 228, 234-35 (1979). Applying this concept, courts have held that intentional sexual harassment violates the Fourteenth Amendment and is actionable under § 1983. Beardsley v. Webb, 30 F.3d 524, 529 (4th Cir.

20

1994). As with Title IX, the standards of Title VII have been applied by courts in §

1983 sexual harassment cases. Id. Title VII precedent recognizes that hostile

environment sexual harassment is a form of sexual discrimination. Meritor Sav.

Bank v. Vinson, 477 U.S. 57, 64, 66 (1986). By combining Title VII and § 1983

standards, it is concluded that in order for an individual to prove hostile

environment sexual harassment in violation of § 1983, she must show that she

was subjected to conduct that was (1) unwelcome,[10] (2) based on her sex, (3)

sufficiently severe or pervasive to create an abusive environment, (4) performed

under color of state law, and that (5) deprived her of her rights, privileges, or

immunities secured by the Constitution or Federal law. Jennings, 240 F. Supp. 2d

at 505-06. Because the crux of this standard, the severity and pervasiveness of

the conduct, is also a part of the analysis for a Title IX claim, the discussion and

conclusion in that section of this Opinion apply equally well here. For the same

reasons stated above, the defendants are entitled to summary judgment on Ms.

Jennings' claims of sexual harassment under § 1983.

3.

In certain situations, supervisory officials may be held liable for the

constitutional injuries inflicted by their subordinates. Shaw v. Stroud, 13 F.3d

791, 798 (4th Cir. 1994). There are three elements in establishing such liability:

---

[10] The "unwelcome" requirement parallels the Title VII requirement of subjective offensiveness. As discussed in note 7 above, the issue of subjective offensiveness need not be reached here.

21

(1) "that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff"; (2) "that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices'"; and (3) "that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." Id. at 799.

Defendants Hooker, Ehringhaus, Swofford, Baddour, and Miller are entitled to summary judgment on this claim. As established above, a reasonable jury could not find that Dorrance or Palladino engaged in behavior that violated Ms. Jennings' constitutional rights. Because their behavior did not pose an unreasonable risk of constitutional injury, it is unnecessary to reach the question of whether these other defendants had knowledge of their behavior. Summary judgment is therefore appropriate on Ms. Jennings' supervisory liability claims under §1983.

C.

Defendants also move for summary judgment on Ms. Jennings' state law claim against Mr. Dorrance for common law invasion of privacy. The state of North Carolina recognizes two types of invasion of privacy actions: (1) appropriation of plaintiff's name or likeness for defendant's advantage, and (2) "intrusion into the seclusion, solitude, or private affairs of another ('intrusion tort')." Miller v. Brooks, 472 S.E.2d 350, 353 (N.C. Ct. App. 1996). See also

22

<u>Broughton v. McClatchy Newspapers, Inc.</u>, 588 S.E.2d 20, 27 (N.C. Ct. App. 2003). Plaintiff's complaint and briefs do not specify, but her claim is assumed to be the latter.

"Generally, there must be a physical or sensory intrusion or an unauthorized prying into confidential personal records to support a claim for invasion of privacy by intrusion." <u>Id.</u> at 29. A defendant's conduct must be "so egregious as to be 'highly offensive to a reasonable person.'" <u>Id.</u> (quoting <u>Smith v. Jack Eckerd Corp.</u>, 400 S.E.2d 99, 100 (N.C. Ct. App. 1991)). It is not enough that plaintiff was offended by the conduct. <u>Jack Eckerd Corp.</u>, 400 S.E.2d at 100. Behavior found by North Carolina courts sufficient to support a claim of intrusion includes physically invading another's home, installing a hidden camera in another's bedroom, rifling through and disposing of an individual's mail, <u>Miller</u>, 472 S.E.2d at 354, and viewing and disseminating personal information in an individual's state personnel file without authorization, <u>Toomer v. Garrett</u>, 574 S.E.2d 76, 90 (N.C. Ct. App. 2002).

In this case, there were two direct inquiries into Ms. Jennings' personal life. Even if one was made crudely, this does not rise to the level of egregious conduct required by North Carolina courts. Ms. Jennings may have been offended, but she declined to answer the questions and that was the end of it. There was no physical or sensory intrusion into her home or personal records analogous to those recognized by North Carolina courts as tortious. Mr. Dorrance is therefore entitled

23

to summary judgment on this claim.

D.

In summary, Defendants' motion for summary judgment on the Title IX claim, the § 1983 claims, and the state law claim against Dorrance will be GRANTED.

V.

In conclusion, Plaintiff's Motion to Strike Amended Answer by Defendants and for Default Judgment [Doc. #137] and Plaintiff's Motion to Strike Exhibits C through H to the Affidavit of Anson Dorrance [Doc. # 142] will be DENIED. Defendants' Motion for Summary Judgment [Doc. #115] will be GRANTED.

This $27\underline{th}$ day of October, 2004

United States District Judge

24